1

2

3

4

5                        UNITED STATES DISTRICT COURT

6                       NORTHERN DISTRICT OF CALIFORNIA

7

8    STEVEN D. JACKSON,                        No. C-10-2521 JCS

9              Plaintiff,                      **ORDER GRANTING DEFENDANT'S MOTION
                                               FOR SUMMARY JUDGMENT**
10       v.
                                               **[Docket No. 23]**
11   SIMON PROPERTY GROUP, INC.,

12            Defendants.
     _____/
13

14   **I.      INTRODUCTION**

15          On Friday, May 20, 2011 at 9:30 a.m., the Defendant Simon Property Group Inc.'s

16   ("Defendant") Motion for Summary Judgment ("the Motion") came on for hearing.[1]  Having

17   considered the papers and arguments of counsel, and for the reasons stated below, the Motion is

18   GRANTED.

19   **II.     BACKGROUND**

20          **A.     Facts[2]**

21          Plaintiff Steven D. Jackson ("Plaintiff") was employed at Stoneridge Mall as the Director of

22   Operations beginning in February 2008.   Joint Statement of Undisputed Facts ("JSUF") 2.

23   Defendant Simon Property Group, Inc. ("Defendant") owns and operates shopping malls throughout

24   the United States, including the Stoneridge Mall in Pleasanton, California.  JSUF 1.  Defendant

25   _____

26          [1]The parties have consented to the disposition of this case before a Magistrate Judge pursuant
     to 28 U.S.C. § 636(c).

27          [2] Unless otherwise indicated, the following facts are taken from the parties' Joint Statement of
28   Undisputed Facts.

considers Stoneridge to be an upscale mall.  JSUF 46  (Pl. Depo. I at 126:23-127:1, Vito Dec.  ¶ . 10).

Colin Vito became the Mall Manager and Plaintiff's direct supervisor in November 2008. JSUF 2 (Pl. Depo I at 128:10-15, 150:6-8, attached to the Stein Dec.; Vito Dec. ¶¶ 1, 5).  Vito began working for Simon in 2005 as an Assistant Mall Manager for a mall in Mission Viejo.  JSUF 3.  He was then promoted to Mall Manager and managed malls in Albuquerque, New Mexico and Aurora, Colorado before being becoming the Mall Manager at Stoneridge.  *Id.*  As Mall Manager, his job duties were to oversee the general operations of the malls he managed from an operations, marketing, and administrative perspective.  JSUF 4 (Vito Dec. ¶ 2).  This included being able to assign tasks to the various departments, including the Operations Department, that he believed needed to be, or should be, done by those departments.  *Id*.  At each of the malls that he managed, Vito oversaw an Operations Department which was run by an Operations Director.  JSUF 5 (Vito Dec. ¶ 3).  If there were more maintenance jobs to be done at a given time than the number of maintenance workers on duty, Vito expected the Director of Operations to handle some of the maintenance duties to ensure that the jobs got done timely.  JSUF 6 (Vito Dec. ¶ 3).  Vito was never told that the Operations Directors were not to perform physical maintenance tasks.  JSUF 7 (Vito Dec. ¶ 3).

As Director of Operations, Plaintiff's main job duty was to oversee the maintenance department and supervise the maintenance workers to ensure that the mall was maintained properly. JSUF 8  (Pl. Depo. II at 226:25-227:7, Pl. Depo. I at 31:7-10, 126:17-22).  Sixty to seventy percent of Plaintiff's job entailed walking the interior and exterior of mall, which is approximately 1,300,000 square feet, to assess the condition of the property.  JSUF 9 (Pl. Depo. at 92:8-93:8). Plaintiff also was to review contracts and to help customers with maintenance issues and build outs. JSUF 10  (Plaintiff Depo. II at 226:25-227:7, Pl. Depo. I at 33:12-22).  He also did occasional physical maintenance tasks, including pushing the mobile sales kiosks stationed in the mall, checking phone and electric lines, putting up light stands, and picking up trash.  *Id.*  Plaintiff's

1    normal working hours were 7:00 a.m. to 7:00 p.m. JSUF 11 (Pl. Depo. I at 52:21-53:1, 54:3-7). He

2    worked five to six days per week, meaning that he worked on average 50 to 70 hours per week. *Id.*

3           Plaintiff put in these hours because the Operations Director position demanded it and he

4    would often be called in to handle issues. JSUF 12 (Pl. Depo. I at 54:8-11). The Job Description

5    for Operations Director position states that Operations Directors may need to carry materials and

6    equipment up to and exceeding 50 pounds. JSUF 13 (Courtney Dec. ¶ 3 and Ex. 28 thereto).

7    Plaintiff recognized that Vito had the authority to assign operations and maintenance tasks to him

8    and the Operations Department. JSUF 14 (Pl. Depo. I at 44:16-21).[3]

9           On February 5, 2009, Vito asked Plaintiff to help a maintenance worker disassemble portable

10   sales kiosks in the mall that were not being used and load them into a storage container. JSUF 15

11   (*id.* at 45:4-13, and Ex. 1 thereto, attached to the Stein Dec. as Ex.1). It was not a typical task

12   performed by the Operations Department, but if it needed to be performed, Vito had the right to

13   assign it to the Operations Department. *Id.* (27:20-28:27). In doing so, Plaintiff suffered a back

14   injury. On February 9, 2009, Plaintiff informed Vito that he injured his back and requested time off,

15   which he was given. JSUF 16 (Pl. Depo I at 49:24-50:7).

16          On February 11, 2009, Plaintiff provided Vito with a doctor's note stating that he would be

17   out of work for two days with a 10 pound lifting restriction. JSUF 17 (Pl Depo. I at 65:7-10,

18   71:25-72:6, Franket Dec. ¶ 4 and Ex. 5 thereto). Plaintiff states that he returned to work on February

19   11, 2009, with his doctor's note, but that Vito ordered him to go home. Pl. Dec. ¶19. Plaintiff

20   returned to work on February 19, 2009. JSUF 18. On that day, Plaintiff came to work with a

21   doctor's note (and gave it to Vito), which stated his work restrictions. *Id.* He could not work more

22   than 4 to 6 hours on a given day, and he would have to rest for 10 minutes every two hours, and

23

24          [3]Plaintiff states in his declaration that when he applied for the job, there was no mention of

25   lifting over 50 pounds, nor was that aspect of the job ever explained to him or described as an "essential
     function" of his position as Operations Director. Pl. Decl. ¶¶ 5, 8, 10. He further states that during his

26   employment with Defendant, lifting was not a regular part of his job performance and that he only
     "performed lifting. . .on rare occasions to assist a maintenance worker, my subordinate, when no other

27   maintenance worker was available." *Id.* ¶ 12

28                                                      3

United States District Court

For the Northern District of California

1  would have to ice his back for an additional 10 minutes every hour.  He was limited to lifting no

2  more than 5 pounds, and in kneeling, climbing, pulling, pushing, stooping and crawling.  *Id.*  (Pl.

3  Depo. I at 52:6-19, 53:11-14, 54:19-55:8 and Ex. 4 thereto, attached to the Stein Dec. as Ex. 4).

4  Plaintiff was taking Vicodin to help with the pain in his back, as well as the muscle relaxant

5  Cyclobenzaprine.  JSUF 19 (Pl. Depo. I at 66:20-67:5 and Ex. 6 thereto, attached to the Stein Dec. as

6  Ex. 6).

7         On February 19, 2009 Plaintiff went back on leave.  JSUF 20.  During his leave, Plaintiff had

8  filed a Workers' Compensation claim and was being compensated through that claim.  *Id.*  (Franket

9  Dec. ¶. 6).  Plaintiff states in his declaration that he reported to work on February 19, 2009, but that

10  Vito sent him home, telling him that he would not accommodate Plaintiff's work restrictions by

11  providing him with light duty.  Pl. Dec. ¶ 21.  Plaintiff states that "at no time did Vito discuss the

12  essential functions of my Operations Director position with me prior to sending me home.  Further,

13  no other manager of defendant discussed with me the essential functions of my position as

14  Operations Director or the provision of an accommodation of my work restrictions prior to Vito's

15  instructing me to go home."  *Id.*

16         On February 21, 2009, Plaintiff went to the doctor.  JSUF 21 (Pl Depo. I at 65:7-10,

17  71:25-72:6, Albright Dec. ¶. 4 and Ex. 5 thereto).  He was placed on "complete bed rest" for two

18  days and told to take medication "around the clock."  *Id.*  The doctor also determined that Plaintiff

19  was not able to perform his usual work.  *Id.*  Plaintiff saw the doctor again on February 25, 2009; he

20  was given a "Work Release" form that stated that he was unable to return to work until March 12,

21  2009.  JSUF 22 (Pl. Depo. I at 72:10-13 an Ex. 7 thereto, attached to the Stein Dec. as ¶ 7).

22         On March 2, 2009, Plaintiff states that he wrote Carol Franket an email requesting that

23  Defendant accommodate his work restrictions as set out in his work release of February 18, 2009.

24  Pl. Dec. ¶ 22.  Plaintiff told Franket that he knew that Defendant through Vito was accommodating a

25  maintenance worker in his department who had a work-related injury by providing him with light

26  duty.  Pl. Dec. ¶ 22, Franklin Dec., Ex. J.  Franket responded by email that "as a company we do not

27

28                                                    4

1  have light duty for our salaried exempt employees.  Workers Compensation will be paying you until

2  you are fully released and ready to return to the workplace." *Id*. (Citing Franklin Dec., Exh. K).

3     Plaintiff went to the doctor again on March 26, 2009.  JSUF 23.  He was given a "Work

4  Release" form that stated that he was unable to return to work until April 13, 2009.  *Id*.  (Pl. Depo. I

5  at 77:8-12, Vito Dec.  ¶ . 21 and Ex. 9 thereto).

6     On April 23, 2009, Plaintiff presented a Work Release, which stated that he could return to

7  work with a lifting restriction of 35 pounds for two weeks.  JSUF 24 (Pl. Depo. I at 81:4-13 and

8  Ex. 10 thereto, which is attached to the Stein Dec. as Ex. 10).  There was no restriction on the

9  number of hours that Plaintiff could work.  Pl. Dec. ¶ 23.  Vito again sent Plaintiff home stating "We

10  are awaiting a full 100% release from your treating physician. . ." *Id*. (Citing Franklin Dec., Ex. Z).

11     On May 7, 2009, Plaintiff provided a "Work Release" form stating that he was returned to

12  full work.  JSUF 25.  As a result, Plaintiff returned to work on or about May 9, 2009.  *Id*.  (Pl. Depo.

13  I at 83:2-18 and Ex. 11 thereto, which is attached to the Stein Dec. as Ex. 11, Complaint ¶ 20).

14  Plaintiff worked his regular shift performing his usual job duties.  JSUF 26 (Pl. Depo. I at 90:7-23).

15  During this time, Plaintiff was still taking Vicodin and a muscle relaxant.  JSUF 27 (Pl. Depo. I at

16  93:9-14).  Plaintiff still had discomfort in his back.  JSUF 28.  On May 11, 2009, he sent an email to

17  Carrie Williams, Director of Marketing and Business Development for Stoneridge, stating that while

18  he was back at work, he did not know how long he could continue to work.  *Id*.  By writing this,

19  Plaintiff meant that he still had tightness in his back and thought he might have to go on leave again.

20  *Id*.  (Pl. Depo. I at 94:8-17, 95:3-17 and Ex. 13 thereto, attached to the Stein Dec. as Ex. 13).  His

21  back injury was also aggravated by walking the mall (Pl. Depo. I at 91:21-92:1).  JSUF 29.  Plaintiff

22  began experiencing a sharp pain in his back and could not get comfortable.  JSUF 30 (Pl. Depo. I at

23  98:1-11).

24     On May 17, 2009, Plaintiff sent an email to, among others, Vito stating that he needed to go

25  to the doctor because of the pain in his back.  JSUF 31.  Plaintiff wrote that "[he has] been in pain

26  since Friday and it has only become worse over the weekend, even with the rest and doing nothing

27

28                                                         5

United States District Court

For the Northern District of California

1    all weekend." *Id.* (Pl. Depo. I at 106:23-107:24 and Ex. 19 thereto, attached to the Stein Dec. as Ex.

2    19).  The next day, May 19, 2009, Plaintiff went to the doctor because of the pain his in back.  JSUF

3    32.  His doctor gave him a Work Release form stating that he was unable to return to work until May

4    22, 2009.  *Id.*  His doctor also put him on "absolute bed rest" for 2 days.  *Id.*  (Pl. Depo. I at

5    97:22-25, 97:2-7, 98:17-23 and Ex. 14 thereto, attached to the Stein Dec. as Ex. 14).  Plaintiff

6    returned to the doctor on May 21, 2009 to have his back examined.  JSUF 33.  He was provided with

7    a Work Release stating that he was unable to return to work until May 29, 2009.  *Id.*  His doctor

8    stated that Plaintiff still had "too much (sic) spasms and inflammation to return to limited duty."  *Id.*

9    (Pl. Depo. I at 100:8-12, 101:8-13 and ex. 15 thereto, which is attached to the Stein Dec. as Ex. 15).[4]

10   Plaintiff provided a Work Release on May 28, 2009 stating that he unable to return to work

11   until June 8, 2009.  JSUF 34.  He was told by his doctor to be on bed rest for two days and to be on

12   medications "by clock" because of the spasms in his back.  *Id.*  (Pl. Depo. I at 102:1-3, 103:11-19,

13   104:1-3 and Ex. 16 thereto, attached to the Stein Dec. as Ex. 16; Vito Dec. ¶ 22 and Ex. 17 thereto).

14   Plaintiff provided the work release to Defendant, but he does not recall to whom he gave it or

15   whether he initiated any discussions with the company about it.  JSUF 35  (Pl. Depo. I at 104:7-25).

16   On June 4, 2009, Plaintiff provided another Work Release from his doctor stating that he was

17   unable to return to work until June 19, 2009.  JSUF 36 (Pl. Depo. I at 105:25-106:3 and Ex 18

18   thereto, which is attached to the Stein Dec. as Ex. 18).

19   On June 18, 2009, Plaintiff sent an email to Defendant stating, "I have just returned from a

20

21   _____

22   [4]Plaintiff states in his declaration that "During the period of May 18, 2009 to August 19, 2009,
     I received work releases indicating a need for accommodations of intermittent medical leaves and/or

23   work restrictions limiting my lifting.  At no time did I receive a work release (doctor's note) which
     stated that I was unable to perform any work of any kind during the period of May 18, 2009 to August

24   19, 2009." Pl. Dec. ¶ 25.  Plaintiff's statements are contradicted by the actual doctor's notes and emails
     that were provided to Defendant during this time period, of which indicated that Plaintiff was not

25   returned to work in any capacity except for a limited time period.  Defendant's argument regarding this
     evidence will be addressed further below.  Plaintiff also states that at no time between May 18, 2009

26   and August 19, 2009, did Defendant initiate any discussions with him about accommodation so that he
     could perform the essential functions of his job, or any available vacant job. He further states that he

27   asked Defendant's managers for an accommodation, but the managers refused to discuss such a
     possibility with him. Pl. Dec. ¶ 30.

28                                                   6

doctor appointment for my on the job injury.  The doctor stated that the earliest I can return to work is 7-6-09.  I have to complete physical therapy and return to the doctor on 7-2-09 at that time the doctor will evaluate my return to work date." JSUF 37  (Pl. Depo. I at 109:3-18 and Ex. 21 thereto, attached to the Stein Dec. as Ex. 21).

On July 2, 2009, Plaintiff sent an email stating: "My return to work date has been extended until at least 7-20-09, for my on the job injury.  The muscle tear in my back is not healing, so my work release has been extended."  JSUF 38 (110:13-111:2 and Ex. 22 thereto, attached to the Stein Dec. as Ex. 22).  Plaintiff was doing physical therapy for his back, but the physical therapy made his back worse.  JSUF 39 (Pl. Depo. I at 111:3-9).

On July 17, 2009, Plaintiff sent an email to Defendant, which stated: "My return to work has been extended by my doctor to 8-10-2009, due to my on the job back injury."  JSUF 40 (*id.* at 111:13-21, 113:7-15 and Ex. 23 thereto, attached to the Stein Dec. as ex. 23).  Dr. Rovner, who was not Plaintiff's treating physician, did not tell Plaintiff how much time he believed that Plaintiff would be out of work.  JSUF 41.  Plaintiff does not recall if Dr. Kemprud told him how long he would be out of work.  *Id.*  (Pl. Depo. at 111:13-21, 113:7-15).

On August 6, 2009, Plaintiff sent an email stating, "I had an appointment today with Dr. Kemprud and my return to work date has been extended to Sep. 9, 2009.  I have been referred to an Orthopedic Surgeon in San Ramon, Ca for treatment to my work related back injury."  JSUF 42 (Pl. Depo. I at 117:16-21, 118:15-17 and Ex. 24 thereto, attached to the Stein Dec, as Ex. 24).

During the time that Plaintiff was on leave, Vito had to find ways to fill the Operations Director position.  JSUF 43.  When Plaintiff first went on leave, Vito performed both his job duties and Plaintiff's.  *Id.* (Vito Dec. ¶ 10).  When it became apparent that Plaintiff would be on an extended leave, Vito determined that he could not continue to do both jobs and be able to do either well.  JSUF 44.  As a result, the Operations Director from another Simon mall in the area, Dustin Cox, was asked to help oversee the Operations Department at Stoneridge on an as-available basis.  *Id.* (Vito Dec. at ¶ 11, Franket Dec. ¶ 9).  Cox would typically work several full days at Stoneridge

United States District Court

For the Northern District of California

per week.  JSUF 45.  However, there were times in which his duties at his other mall prevented him from working more than a few hours on a given day.  *Id*. (Vito Dec. ¶12).

On days where Cox was not able to help Vito, Vito would have difficulty completing his job duties and the Operations Director's duties.  JSUF 47  (Vito Dec. ¶ 13).  The times where Cox could not work full days at Stoneridge "also caused issues."  *Id*.  On those days, Vito would have to spend time determining the status of the projects that Cox was overseeing that were not complete.  *Id*.  Vito believed this was not an efficient use of his time because it essentially meant that he had to repeat work that Cox had already done instead of performing his own job duties.  On occasions, he gave directions that were contrary to those that Cox had given, causing confusion among the maintenance staff.  *Id*.  During the time that Plaintiff was on his first leave, Vito performed both the Mall Manager and Operations Director positions.  JSUF 48 (Vito Dec. ¶ 10).  As such, there were maintenance issues that were not being addressed as soon as needed.  *Id*.

On August 19, 2009, Franket sent a letter to Plaintiff informing him of the decision to terminate his employment.  JSUF 49 (Pl. Depo. II at 259:17-260:8 and Ex. 29 thereto, attached as Ex. 29 to the Stein Dec).  The letter stated, "All leave available to you, including leave under the Family Medical Leave Act and California Family Rights Act has been exhausted.  Due to continuing business needs at the mall, we find it necessary to fill your position and to terminate your employment. *Id*.

In August 2008, Plaintiff states that he hired two Asian men to do work in the maintenance department.  Pl. Dec. ¶ 14.  In November 2008, Plaintiff's supervisor Vito asked Plaintiff why he hired the two Asians to work at the mall.  Plaintiff states that he told Vito that he had hired the most qualified people, and that in response, "Vito shook his head in disgust and walked away."  *Id*.

In or about 2008 and 2009, Paragon Services was under contract with defendant to provide janitorial services at the Stoneridge Mall.  Paragon's site supervisor was a Hispanic female, Rocio Castro.  JSUF 52 (Plaintiff Dec. ¶ 15).  Plaintiff alleges that in December of 2008, his supervisor Vito told him that he did not want Castro working as site supervisor because she did not speak

English well enough.[5]  Pl.'s Dec. ¶ 15.  Plaintiff states that he refused to initiate the firing of Castro because he felt that Vito's request to fire her was discriminatory.  *Id.*  When Plaintiff refused Vito's request to fire Castro, Plaintiff claims that Vito told Plaintiff that he was "not a team player."  *Id.*  The Vice President of Paragon Services, Steve Coto, states that soon after Vito became the Mall Manager at Stoneridge in October 2008, he began complaining about the fact that Castro spoke English with an accent.  Declaration of Steve Coto ("Coto Dec.") ¶ 4.  Coto declares that Vito told him to "get rid" of Castro.  *Id.* ¶ 5.  Initially, Coto argued with Vito, stating that Castro was an excellent employee; however, Vito continued pressuring Coto to fire Castro from her position.  *Id.*  For the next nine months, Coto states that he was pressured by Vito to remove Castro from her job.  *Id.*  Finally "in an effort to save Ms. Castro's job, [Coto] removed her from her supervisor position and transferred her from her day shift (about 6:00 a.m. to 2:30 p.m.) to the graveyard shift (10:00 p.m. to 6:30 a.m.).  *Id.*  According to Plaintiff, after he refused to fire Castro, Vito became very curt and hostile, saying things like "I guess you are not my guy."  Pl. Dec. ¶¶ 15-19.  Plaintiff recalls that Vito began criticizing him and his performance without justification.  Prior to these events, Plaintiff's job performance had been satisfactory.  *Id.*  Nevertheless, on January 30, 2009, Vito gave Plaintiff a progressive performance counseling memorandum, pointing out alleged deficiencies in plaintiff's performance as Operations Director.[6]  JSUF 53 (Ex. 32 to the Stein Dec.).  Plaintiff submitted a written response, refuting Vito's allegations of performance deficiencies.  Pl. Dec. ¶ 18.

### B.   Procedural History

On May 4, 2010, Plaintiff filed a complaint in state court alleging the following claims:  1) employment discrimination based on physical disability/medical condition, in violation of the Fair Employment and Housing Act ("FEHA"), Cal. Gov. Code § 12940 *et. seq.*; 2) failure to engage in

---

[5]Defendant objects to this portion of Plaintiff's declaration on the ground that it contradicts his deposition testimony.  This objection is OVERRULED.  The deposition testimony provided by Defendant on this point is vague and it is clear that Plaintiff is unsure of the dates, whether these events occurred in December 2008 or January 2009.  *See* Jackson Depo. Tr. 212:

[6]Plaintiff points out that in this memo, there is no mention of any requirement that Plaintiff life over 50 pounds as part of his performance expectations.  Pl. Dec. ¶ 17.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    the interactive process in violation of FEHA, Cal. Gov. Code § 12940 (n) *et seq.*; 3) failure to

2    provide reasonable accommodation, Cal. Gov. Code § 12940 (m) *et seq.*, 4) discrimination in

3    violation of the Family Medical Leave Act ("FMLA") 29 U.S.C. § 2601 *et. seq.*; 5) interference in

4    violation of the FMLA 29 C.F.R. § 825.220(a)(1); 6) retaliation in violation of the FMLA, 29 U.S.C.

5    § 2615(a)(1)(2) and California Government Code § 12940 (h); 7) failure to prevent retaliation and

6    discrimination under the FMLA and Cal. Gov't. Code; 8) termination in violation of public policy.

7    Plaintiff sought compensatory and punitive damages, attorneys' fees and interest.  Defendant

8    removed the action to this court on June 8, 2010.

9        On March 25, 2011, Defendant filed its Summary Judgment Motion.  Plaintiff opposes the

10    Motion.  Both parties have filed numerous evidentiary objections.

11    **C.    The Motion**

12        Defendant asserts in its Summary Judgment Motion that all of the claims alleged in

13    Plaintiff's original complaint fail as a matter of law.  Defendant argues that Plaintiff's first cause of

14    action for disability discrimination under the California Fair Employment and Housing Act fails as a

15    matter of law because Plaintiff cannot establish a prima facie case of disability discrimination, and

16    Plaintiff cannot establish that the legitimate, non-discriminatory reason for his termination was a

17    pretext for discrimination.  Defendant argues that Plaintiff's second cause of action for failure to

18    engage in the interactive process fails as a matter of law because Plaintiff was not a qualified

19    individual, and Defendant did engage in the interactive process.  The third cause of action for failure

20    to accommodate fails as a matter of law because Plaintiff was not a qualified individual, and

21    Defendant did provide Plaintiff with a reasonable accommodation for his disability.  Defendant

22    argues that Plaintiff's fourth cause of action for discrimination under the Family Medical

23    Leave Act fails as matter of law because the Ninth Circuit does not recognize such a cause of

24    action, and even if it did, Plaintiff cannot establish her prima facie case or that Defendant's

25    legitimate, non-discriminatory reason for terminating his employment was a pretext for

26    discrimination.  With regard to the fifth cause of action, for interference with his rights under the

27

28                                                              10

United States District Court

For the Northern District of California

1    Family Medical Leave Act, Defendant argues that this claim similarly fails as a matter of law

2    because Plaintiff is not a qualified individual and he was given all of the time off work required

3    under the Act.

4         Plaintiff's sixth cause of action for retaliation under the Fair Employment and

5    Housing Act fails as a matter of law because Plaintiff cannot establish his prima facie case that

6    his employment was terminated because of he engaged in protected conduct, and Plaintiff cannot

7    establish that the legitimate reason given for his termination was pretext for retaliation.  Plaintiff's

8    sixth cause of action for retaliation under the Family Medical Leave Act fails as a matter of law

9    because Plaintiff cannot establish her prima facie case that his employment was terminated because

10   he engaged in protected conduct, and Plaintiff cannot establish that the legitimate reason given for

11   his termination was pretext for retaliation.

12        Defendant argues that Plaintiff's sixth and seventh causes of action for retaliation and failure

13   to prevent retaliation and discrimination fail as a matter of law because he cannot establish a prima

14   facie case that he received a write up because he engaged in protected conduct or that his write-up

15   was a pretext for retaliation nor can he establish that he was retaliated or discriminated against.

16   Defendant further argues that Plaintiff's eighth cause of action for wrongful termination in violation

17   of public policy fails as a matter of law because Plaintiff cannot establish his prima facie case and

18   cannot prove that Defendant's legitimate, non-discriminatory reason for terminating his employment

19   was a pretext for retaliation or discrimination.

20         In his Opposition, Plaintiff argues that he has come forward with sufficient evidence that he

21   was a qualified individual and was capable of performing work and should have been

22   accommodated by Defendant.  Plaintiff argues that his failure to engage in the interactive process

23   and interference claims are supported by evidence and that summary judgment is inappropriate in

24   this case.  Plaintiff argues that Defendant's stated reason for his termination was a pretext for

25   disability discrimination and as a result of Plaintiff having participated in protected conduct.

26   Plaintiff argues that Defendant failed to accommodate his disability by failing to engage in the

27

28                                                    11

interactive process, or by offering him an alternative part-time work schedule and/or offering him a different position within the company. Finally, Plaintiff argues that the evidence supports his claim that he was terminated in violation of public policy.

## III.   ANALYSIS[7]

### A.   Summary Judgment – Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 411 U.S. 242, 255(1986).

### B.   State Discrimination Claims Based on Disability/Medical Condition (FEHA) as a Result of Plaintiff's Termination

Defendant asserts that Plaintiff's claims under FEHA fail because Plaintiff cannot make out a prima facie case of discrimination under the California Fair Employment and Housing Act because

---

[7]As a threshold matter, the Court notes that Plaintiff and Defendant object to portions of the evidence and declarations submitted by the other party. To the extent that the Court has relied on evidence to which Defendants object, that evidence is noted in this opinion, and the objections are overruled.

United States District Court

For the Northern District of California

1    he has not satisfied his burden of demonstrating that he was a "qualified individual." Motion at 10.

2    Defendant argues further that even if Plaintiff had made out a prima facie case of discrimination, he

3    has not presented substantial and probative evidence of pretext in the face of the legitimate, non-

4    discriminatory reasons offered by Defendant for Plaintiff's termination.  The Court agrees.  Based

5    on the evidence offered by Plaintiff, no reasonable jury could conclude that he was terminated based

6    upon his disability.  The claims will be addressed below.

7                     **1.      Discrimination Under FEHA – Legal Standard**

8             It is unlawful, under FEHA, for an employer "because of . . . national origin . . . physical

9    disability . . . medical condition  . . . age, . . . to discharge the person from employment . . . or to

10   discriminate against the person in compensation or in terms, conditions, or privileges of

11   employment."  Cal. Gov. Code § 12940(a).  California courts consider FEHA claims to be analogous

12   to discrimination claims brought under Title VII and apply the burden-shifting framework developed

13   by federal courts to address such claims.  *See Guz v. Bechtel Nat. Inc.*, 24 Cal.4th 317, 354 (2000).

14            Under that framework, the plaintiff must first establish a prima facie case of discrimination.

15   *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  For the purposes of summary

16   judgment, a prima facie case requires the plaintiff to "produc[e] enough evidence to permit the trier

17   of fact to infer the fact at issue."  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n. 7

18   (1981).  The burden of proving a prima facie case is "not onerous."  *Id.* at 253.  Once a plaintiff has

19   established a prima facie case, the burden shifts to the employer to produce some evidence that it

20   had legitimate, nondiscriminatory reasons for the employment decision.  *Watson v. Fort Worth Bank*

21   *& Trust*, 487 U.S. 977, 985 (1988).  Once an employer has produced such evidence, the plaintiff can

22   survive summary judgment only by providing "significant, substantial evidence of pretext."  *Steckl*

23   *v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983).

24            To make a prima facie case of discrimination based on national disability discrimination,

25   Plaintiff must show that (1) he suffers from a disability, (2) he is a qualified individual capable of

26   performing the essential functions of the job with or without a reasonable accommodation, and (3)

27

28                                                     13

United States District Court

For the Northern District of California

1    he was subject to an adverse employment action because of the disability. *Brundage v. Hahn*, 57

2    Cal.App.4th 228, 236 (1997); *see also Harris v. United Parcel Service, Inc.*, 2009 WL 1916930

3    (N.D. Cal., July 1, 2009) citing *Jensen v. Wells Fargo Bank*, 85 Cal.App.4th 245, 254-55, 102

4    Cal.Rptr.2d 55 (2000).

5          **2.**       **Application of the Law to the Facts of the Case – Prima Facie Case**

6          The Court finds that Plaintiff has not satisfied the elements listed above for a prima facie

7    case of discrimination based upon disability.  In particular, although he has presented evidence that

8    he suffered from a disability, he has failed to demonstrate that he was a "qualified individual."

9          Plaintiff argues that he could have worked a part-time schedule, or performed tasks that do

10   not involve heavy lifting and that as a result, he was not totally disabled and should have been

11   accommodated.  He argues that with accommodation such as "light work duty" or a transfer to a

12   different position, he could have performed the essential functions of his job (or a different job).

13   The Court must determine whether Plaintiff is a "qualified individual" within the meaning of the

14   law.  If not, the inquiry as to the prima facie showing ends.

15         Here, the undisputed evidence shows that Plaintiff was totally disabled and that Defendant

16   was not provided evidence indicating that Plaintiff could perform any tasks, let alone heavy lifting

17   tasks.  While Plaintiff now argues in opposition to the Motion that he could have worked part-time,

18   or worked a different schedule, or a different job such as a desk job, his arguments are contradicted

19   by the medical evidence submitted to Defendant during the relevant time period.  Specifically, other

20   than the Work Release dated February 18, 2000, which returned Plaintiff to work with limitations,

21   (*i.e.*, he was permitted to work for seven days with a lifting restriction of no more than 5 pounds,

22   with 10 minute rest breaks every two hours and no more than 4-6 hours of work per day), Plaintiff

23   was not cleared to work at all between the date of his injury and April 23, 2009, when he again

24   submitted a Work Release that contained restrictions of lifting not more than 35 pounds for two

25   weeks.  Pl.'s Decl. ¶ 20, Stein Decl., Ex. 4.  On May 7, 2009, he received a work release clearing

26   him to work without limitations.  Stein Decl., Ex. 11.  Even so, less than two weeks later, he was

27

28                       14

United States District Court

For the Northern District of California

again unable to work at all.  On May 18, 2009, he experienced a flare-up of his back pain and remained unable to work through August 2009 when he was terminated.  His doctor reported that he could not return to work at all from May 19 through September 9, 2009.  *See* Stein Decl., Ex. 14 ("unable to return to work until 5-22-09"); Ex. 15 ("Unable to return to work until 5-29-09"); Ex. 16 ("unable to return to work until 6-8-09"); Ex. 18 ("unable to return to work until 6-19-09"); Ex. 21 ("The doctor stated that the earliest I can return to work is 7-6-09"); Ex. 22 ("My return to work date has been extended until at least 7-20-09, for my on the job injury.  The muscle tear in my back is not healing, so my work release has been extended.") Ex. 23 ("My return to work has been extended by my doctor to 8-10-2009, due to my on the job back injury."); Ex. 24 ("I had an appointment today with Dr. Kemprud and my return to work date has been extended to *Sept. 9, 2009*") (emphasis added).

The Ninth Circuit's decision in *Kennedy v. Applause, Inc.,* 90 F.3d 1477 (9th Cir., 1996) is instructive.  There, the plaintiff went on a three month medical leave for Chronic Fatigue Syndrome. *Id.* at 1479.  She returned to work after her first leave worked for about a month before taking second medical leave.  *Id.*  She submitted a doctor's note to her employer stating that she had to take another medical leave, and her employer terminated her employment.  *Id.*  The plaintiff brought an action for, among other things, disability discrimination.  *Id.*  The plaintiff testified at her deposition that she was not totally disabled and could have performed the essential functions of her job with a reasonable accommodation. *Id.*  The defendant moved for summary judgment on the ground that the plaintiff was not a qualified individual because she had represented in applications for state disability payments that she was unable to perform her job and because her doctor had provided medical certifications stating that she was not able to work.  The District Court granted the motion for summary judgment and the Ninth Circuit affirmed.

The Ninth Circuit found that the plaintiff was not a qualified individual and could not establish her prima facie case of disability discrimination.  When the plaintiff went on her second medical leave, her physician determined that the plaintiff was totally disabled from working

**United States District Court**
For the Northern District of California

1    either full-time or part-time.  The court held that this established that the plaintiff was not a

2    qualified individual and could not establish a prima facie case of disability discrimination.  *Id.* at

3    1481-1482.  The Court was unpersuaded by the plaintiff's deposition testimony that she was not

4    totally disabled and could have worked on a modified work schedule.  *Id*  The court found that her

5    testimony "flatly contradict[ed] . . . the medical evidence."  *Id.*  As a result, her deposition testimony

6    could not establish that she was a qualified individual.  *Id.*  The Court was also persuaded by the

7    sworn statements plaintiff had provided to the Social Security Administration, claiming that she was

8    disabled.  *Id.*

9            The present case is similar.  At the time that Defendant terminated Plaintiff's employment,

10   the medical documents indicated that Plaintiff was not able to work at all. The Work Release forms

11   from his doctors repeatedly extended his leave, indicating that he was either incapable of working,

12   on bed rest, or at times, taking medication "around the clock."  In addition to the numerous doctor's

13   notes submitted to Defendant indicating total disability, Plaintiff sent emails stating that his back

14   was not healing, that the pain was not getting better, and confirming that he could not work at all,

15   *i.e.*, stating that his return to work date would have to be "extended."  Thus, the undisputed evidence

16   indicates that Plaintiff could not perform any of his job functions, let alone the disputed "essential"

17   ones.

18           Plaintiff argues that he could have done his job on a part-time basis working 4 to 6 hours per

19   day.  As the Ninth Circuit concluded in *Kennedy*, Plaintiff's characterization of his condition is

20   contradicted by his own doctor's medical opinion and his own statements to his employer, informing

21   his managers that his leave would have to be extended and that there was no timetable for his future

22   return to work.  *Kennedy*, 90 F.3d at 1481.  As explained persuasively by one district court judge:

23   "Even if a doctor were to testify later in deposition or at trial that plaintiff was physically able to

24   have performed work with modifications, it would not alter the facts as they were plainly presented

25   to [defendant] at the time.  To rule in favor of plaintiff on this point would be to hold that the

26   employer should have returned plaintiff to work when the professional medical judgment was that he

27

28

United States District Court

For the Northern District of California

1    was physically incapacitated." *Swonke v. Sprint Inc.*, 327 F.Supp.2d 1128, 1133 (N.D. Cal. 2004)

2    (Henderson, J.) (Citations omitted).  There, as in the present case, for many months, prior to each

3    anticipated return date, the plaintiff submitted doctor's notes excusing plaintiff for longer periods of

4    time.  *Id.*  Accordingly, the district court granted summary judgment in favor of the employer,

5    concluding that plaintiff had not established that he was a "qualified individual."  *Id.* at 1135-36.

6            The Plaintiff's prima facie case fails for an additional reason.  Even if Plaintiff were

7    physically capable of working part-time, the Court nevertheless finds that he would not be a

8    "qualified individual" due to the fact that the undisputed facts demonstrate that an essential function

9    of the Operations Director's job is being able to work at the mall full-time.  Defendant has submitted

10   evidence that the Operations Director has to oversee the entire maintenance and operations of the

11   mall and supervise the maintenance workers and that a full-time Operations Director is needed to

12   oversee the department.  JSUF 8, 11, 12; Declaration of Rob Courtney, ¶ 5.  Defendant's evidence is

13   supported by Plaintiff's own testimony, in which he stated that his job required him to work between

14   50 and 70 hours per week.  Pl.'s Dec. ¶ 11.  Full-time attendance at work can be an essential job

15   function.  *See e.g., Mulloy v. Acushnet, Co.*, 460 F.3d 141, 148-153 (1st Cir. 2006).  Plaintiff has

16   admitted that he could not perform this essential function of his job.  Although Plaintiff argues that

17   he could have performed his job on a part-time basis (4-6 hours per day), this argument is not

18   evidence, and further, it is contradicted by his own deposition testimony in which he testified that his

19   job required him to work 50-70 hours per week.  *See e.g., McEnroe v. Microsoft Corp.*, 2010 WL

20   4806864 *2  (E.D.Wash., Nov. 8, 2010) ("Plaintiff's subjective belief as to what a job's essential

21   functions are comprised of is not evidence").  As a matter of law, Plaintiff cannot be a qualified

22   individual if his own doctors had not released him to attend his job.  *See e.g.,  Hatchett v. Philander

23   Smith College*, 251 F.3d 670, 675 (8th Cir. 2001) (a plaintiff is not a qualified individual if he cannot

24   perform the essential functions of an eight-hour job on a part-time basis).

25           Plaintiff's argument that he could have worked another position is similarly unsupported by

26   the evidence.  Opp. at 16.  Plaintiff argues that he could have worked a desk job, or taken a

27

28                                                17

United States District Court

For the Northern District of California

marketing position within the company.  Putting aside for the moment that the undisputed evidence submitted by Defendant indicates that the jobs Plaintiff mentions in his declaration would result in promotions, the medical evidence presented to Defendant at the time is contrary to Plaintiff's current assertions.  The medical evidence submitted on repeated occasions to the human resources department stated that Plaintiff was unable to work.  The Plaintiff's physician checked the box "unable to work" not "unable to work with the following limitations."  Thus, given the fact that Plaintiff was unable to work, there was no other available job to which Plaintiff could have been assigned.

Even if Plaintiff had been able to perform some work, the only other option Plaintiff would have had in the Operations Department was to become a maintenance worker.  *See* Vito Dec. Para. 16.  The evidence is undisputed that a maintenance worker position would have required more physical tasks than Plaintiff's original position.  Defendant has submitted evidence that demonstrates that there were no other management positions available in the mall.  Plaintiff does not dispute this evidence.  The Court finds that Defendant was not obligated to create a new job for Plaintiff or reassign him if it had no vacant position for him.  *See* Cal.Gov't.Code section 12926(n), *Spitzer v. Good Guys, Inc*., 80 Cal.App.4th 1376, 1389 (2000) (Under FEHA, an employer is relieved of the duty to reassign a disabled employee whose limitations cannot be accommodated in his job if there is no vacant position for which the employee is qualified).

Thus, the Court finds that Plaintiff has not made out a prima facie case of disability discrimination.  This failure is fatal to Plaintiff's claims for disability discrimination, retaliation, and failure to engage in the interactive process.[8]

---

[8]The interactive process claim fails because there was nothing for defendant to do until it received notice that Plaintiff would be released to work with or without limitations.  As one court explained: "The Court cannot impose upon the employer an obligation to engage in a process that was guaranteed to be futile."  *Swonke*, 327 F. Supp.2d at 1137.

United States District Court

For the Northern District of California

### 3.     Plaintiff Fails to Rebut Defendant's Proffered Nondiscriminatory Reason

Assuming for the sake of argument that Plaintiff were able to make out a prima facie case of disability discrimination, the Court finds that Plaintiff has failed to rebut Defendant's proffered nondiscriminatory reason for the termination – Defendant needed a Director of Operations to be able to be at work full-time and perform the essential functions of the job.  According to the medical evidence and emails before it, Defendant determined that Plaintiff was not able to work at all, let alone perform the essential function of his job.  Further, it had been six months and Plaintiff had not provided his employer with any timetable for his return to work; rather, he sent repeated emails informing his employer that his return to work date would be "extended."  Thus, Defendant decided to terminate Plaintiff's employment and hire a new Director of Operations.

Because Defendant has presented evidence of a legitimate non-discriminatory reason for termination, the burden shifts to back to the Plaintiff to present substantial evidence of pretext.  The Court concludes that he has not done so.

To establish that Defendant's reason for terminating Plaintiff was a pretext for disability discrimination, Plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence, and hence the employer did not act for [the asserted] non-discriminatory reasons." *Hersant v. Dep't. of Social Services*, 57 Cal.App.4th 997, 1005 (1997).  To prove pretext, Plaintiff must proffer "specific, substantial evidence." *Id.*; *Crosier v. United Parcel Service, Inc*., 150 Cal.App.3d 1132.  Assertions and conjecture that an employee had a discriminatory motive will not establish pretext. *Martin v. Lockheed Missiles & Space Co., Inc*., 29 Cal.App.4th 1718, 1735 (1994). If, considering the employer's non-discriminatory explanation for its actions, "the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory," summary judgment should be granted in favor of the employer.  *Guz v. Bechtel National*, Inc., 24 Cal.4th 317, 361 (2000).

United States District Court

For the Northern District of California

1    Here, Plaintiff has not presented evidence from which a jury could conclude that the

2  explanation offered by Defendant – that Plaintiff was fired based Defendant's need to fill the

3  position with a full-time employee who is capable of performing the essential functions of the

4  position – is unworthy of credence.  Plaintiff's evidence of discriminatory intent consists of the

5  allegation that seven months previously, his supervisor, Vito, asked him to fire a Hispanic sanitation

6  worker and then when Plaintiff refused, Vito became curt and hostile and two months later

7  submitted a performance review criticizing Plaintiff's job performance.  Plaintiff has also presented

8  evidence that prior to this incident, Vito asked him why he hired two Asian workers and when

9  Plaintiff explained that they were the most qualified applicants, Vito shook his head in disgust and

10  walked away."  Pl. Decl. ¶ 14.[9]  These actions, however, occurred some seven to eight months prior

11  to Plaintiff's termination.[10]  This time delay is fatal to Plaintiff's claim that his termination was

12  somehow connected to these acts.

13    A significant delay between the allegedly discriminatory act and the adverse employment

14  action (when a plaintiff relies upon mere temporal proximity) can be fatal to a plaintiff's

15  discrimination claim.  *See e,g, Richmond v. ONEOK, Inc*., 120 F.3d 205, 209 (10th Cir. 1997) (three

16  month period between the activity and termination standing alone insufficient to establish causal

17  nexus); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992) ("The temporal proximity of

18

19    [9]There is some dispute about this testimony.  At Plaintiff's deposition, he did not say that Vito
   "shook his head in disgust" as he now states in his declaration.  Defendant's Objection to the
20  Declaration of Steven Jackson at 7.  Rather, at his deposition, he said that Vito gave him a "funny look"
   and walked away.

21    [10]Plaintiff also argues, without evidentiary support, that "[i]n February of 2009, Vito (defendant)
22  refused to grant plaintiff an accommodation for his disability" as further evidence of a pattern of
   antagonistic conduct.  Opp. at 22.  The undisputed evidence, however, demonstrates that Plaintiff was
23  granted twice the amount of leave required under federal law, and that Plaintiff was not cleared to work
   by his own medical doctors in order to work the part-time schedule or "light duty" that he now claims
24  he should have been provided.  Plaintiff's reference to maintenance worker Roberto Firmeza's light
   duty/modified work schedule is a red herring.  *See* Opp. at 22.  The evidence in this case demonstrates
25  that Mr. Firmeza was not a salaried managerial employee and that full-time employment was not an
   essential function of his job.  Franket Suppl Decl. ¶5.  Additionally, his medical doctors had cleared him
26  to perform the essential functions of his job (*e.g.*, lifting "up to and more than 50 pounds") with certain
   limitations as to the use of his right hand.  Fermeza Decl. ¶3.  Thus, Plaintiff's claim of differential
27  treatment on account of Firmeza's schedule is unfounded.

28                                          20

United States District Court

For the Northern District of California

1   [plaintiff's] filing and the issuance of either letter, standing by itself, does not sufficiently raise the

2   inference that [the plaintiff's] filing was the reason for the adverse action.  Hughes is required to

3   produce such evidence if he is to defeat the [defendant's] summary judgment motion on this issue.")

4        While Plaintiff is correct that a "pattern of antagonism" may create an inference of a causal

5   nexus of retaliation, Plaintiff has made no such showing here.  Opp. at 22 (citing *Porter v. Cal.*

6   *Dep't. of Corr.*, 419 F.3d 885, 812 (9th Cir. 2005).  As Defendant correctly points out, in order for

7   an alleged "pattern of antagonism" to establish that there was continuing retaliation against plaintiff

8   for engaging in protected conduct, Plaintiff must show that the acts were in some way damaging to

9   his employment.  Def.'s Reply at 14 (*citing Yanowitz v. L'Oreal USA, Inc.*, 36 Cal.4th 1028, 1055-6

10  (2006)).  There is no evidence of any ongoing pattern of antagonism or discrimination such that a

11  rational trier of fact could conclude that Plaintiff's termination and Vito's discriminatory conduct

12  seven months earlier are causally related.  The Court finds that Plaintiff has not made the requisite

13  causal showing to make out a claim for discrimination or retaliation.  Accordingly, the Court finds

14  that this evidence of pretext is not sufficient to defeat Defendant's summary judgment motion.

15       **4.      Plaintiff's FMLA Claims[11]**

16       In order to establish a claim for interference under the FMLA, the Plaintiff must show that

17  his employer discouraged him from taking leave under the FMLA or avoided the employer's use of

18  leave.  29 C.F.R. §§ 825.220 (b).

19       Plaintiff argues first that he was able to work during the time period from May to August

20  2009, and that defendant has failed to provide evidence that he was unable to return to work.

21  Plaintiff further argues that his employer never told him that the more than 12 weeks of leave he

22  received was designated "FMLA leave" and that as such, he states a claim for interference.  Opp. at

23  ─────────────────────

24       [11]Defendant moved for summary judgment first on the ground that the FMLA does not provide
a cause of action for discrimination.  Rather, claims for retaliation discrimination for taking FMLA leave
25  are to be construed as interference claims.  *See Bachelder v. America West Airlines*, 259 F.3d 1112,
1124 (9th Cir. 2001) (*McDonnell-Douglas* burden shifting analysis inapplicable to "retaliation" claims
26  under FMLA; such claims are not "retaliation claims" but rather, interference with FMLA rights).
Plaintiff does not oppose this portion of the motion, and summary judgment on Plaintiff's FMLA
27  discrimination claim (Claim 4) is GRANTED.

28                                      21

20 citing 29 C.F.R. § 825.300(b) and (c)(5).  Finally, Plaintiff objects to the declarations of

Courtney, Vito, Albright and Franket to the extent that these witnesses state the essential functions

of Plaintiff's job because these declarations "lack foundation" or somehow do not know the essential

functions of the Operations Manager position.

The Court is not persuaded by these arguments.  First, for the reasons stated previously, the

Court has concluded that Plaintiff's own evidence – emails and doctor's notes – are sufficient to

establish that Plaintiff was not able to engage in the essential functions of his job.  Moreover,

whether or not his employer designated the leave as "FMLA leave," Plaintiff does not dispute that

he was given more than 12 weeks of leave (the time permitted under the FMLA) during the relevant

time period.[12]  The record in this case permits no inference that Defendant denied or interfered with

Plaintiff's exercise of his rights to leave.  It is undisputed that Plaintiff was entitled to a maximum of

12 workweeks of leave under § 2612(a)(1)(D); and that he received those 12 weeks of leave.  The

fact that Plaintiff was not restored to his position at the end of the more than 12-week period did not

infringe his FMLA rights because it is also undisputed that at the end of that period he remained

unable to perform the essential functions of his Operations Manager position.  Thus, under 29 C.F.R.

§§ 825.216(d) and § 825.214(b), the FMLA did not entitle Plaintiff to be restored to his former

position or to any other position.

Accepting as true for purposes of summary judgment that Defendant failed to inform

Plaintiff that the leave it was providing him was designated "FMLA leave" the Court is persuaded

by an opinion from the Second Circuit *Sarno v. Douglas Elliman*, 183 F.3d 155, 161-162 (2d Cir.

1999).  There, on similar fact, the court concluded that no rational finder of fact could conclude that

Plaintiff's exercise or attempted exercise of his FMLA rights was in any way affected by

---

[12]Indeed, Plaintiff received more than twice the amount of leave required under the FMLA.  It is undisputed that Plaintiff was on leave for approximately 12 weeks from February 9, 2009  until he returned to work on May 7, 2009.  He re-injured his back and went back on medical leave on May 19, 2009.  He remained on leave continuously, as he submitted doctors' notes extending his leave through September 9, 2009, which resulted in three months of additional leave until the date of his termination on August 19, 2009 (in addition to the 12 weeks from February-May 2009).

Defendant's failure to inform him that the Act entitled him to a leave of up to 12 work weeks.  The Court explained

> Assuming *arguendo* that [Plaintiff] should have been given more explicit notice than was given (we note that the Act itself provides only for the posting of summary notices, *see* 29 U.S.C. § 2619(a), and that the additional notice provisions set out in the regulations are highly ambiguous, see 29 C.F.R. §§ 825.301(a)(1), (a)(2), (b)(1)(i)-(viii), and (b)(2)), [Plaintiff's] right to reinstatement could not have been impeded or affected by the lack of notice because his leave was caused by 'a serious health condition that [made him] unable to perform the functions of [his] position,' 29 U.S.C. § 2612(a)(1)(D), and it is undisputed that that inability continued for some two months after the end of his 12-week FMLA leave period. Any lack of notice of the statutory 12-week limitation on FMLA leave could not rationally be found to have impeded [Plaintiff's] return to work.

*Id.*, 161-162.

Further, the court rejected the Plaintiff's effort to have his FMLA claim be based solely upon "failure to give notice."  The court explained:

> Finally, to the extent that [plaintiff] contends that the assumed right to notice stands as an independent right under the Act, and that an employee may sue the employer for failure to give notice even if that failure in no way affected the employee's leave, benefits, or reinstatement, we reject that contention. The Act makes it unlawful for the employer to impede an employee's actual or attempted "exercise" of a right provided under subchapter I. A right to receive notice is not a right that the intended recipient of the notice "exercise[s]." We decline to interpret the FMLA as giving an employee a right to sue the employer for failing to give notice of the terms of the Act where the lack of notice had no effect on the employee's exercise of or attempt to exercise any substantive right conferred by the Act.

*Id.* at 162.

Here, Plaintiff argues weakly that "an employer's failure to notify a plaintiff of his FMLA rights may constitute 'interference' with FMLA rights."  Opp. at 20.  The Court is persuaded by the court's analysis in *Sarno* and concludes that no claim for interference under the FMLA claim can be stated as a matter of law.

Finally, with respect to Plaintiff's objections to Defendant's declarations on the issue of what constitutes the "essential functions" of Plaintiff's position, these evidentiary objections are overruled.  Defendant's witnesses have ample knowledge of the job description of Operations Manager and can testify as to the expectations of the position.  In any event, their descriptions of what is essential to the position are irrelevant given that the Court has found that Plaintiff was not

United States District Court

For the Northern District of California

1 cleared by his own doctor to perform *any* work, let alone what may or may not be the essential

2 functions of his position.

3      **5.**      **Wrongful Termination in Violation of Public Policy**

4      Defendant asserts that it is entitled to summary judgment on Plaintiff's claims for wrongful

5 termination in violation of public policy because these claims are based on her claims under FEHA,

6 the FMLA, which Defendant asserts fail for the reasons discussed above.  These claims rise and fall

7 with her remaining claims.  Because Defendant is entitled to summary judgment as to Plaintiff's

8 claims as they relate to wrongful termination based on disability, summary judgment on Plaintiff's

9 violation of public policy claim is GRANTED.

10 **IV.**      **CONCLUSION**

11      For the reasons stated above, Defendant's Summary Judgment Motion is GRANTED.

12 The Clerk shall close the file.

13      IT IS SO ORDERED.

14 Dated: June 17, 2011

15

16      JOSEPH C. SPERO
     United States Magistrate Judge

17

18

19

20

21

22

23

24

25

26

27

28      24